STOKER, Judge.
The plaintiff, Premiere Casing Services, Inc., appeals the judgment of the trial court dismissing its suit against the defendant, Vareo International, Inc. Judgment was rendered against the plaintiff and in favor of the defendant on defendant’s reconven-tional demand for sums due on open account in the amount of $67,129.06. No appeal is taken from that judgment. We affirm the trial court.
The trial judge who decided this case wrote excellent and extensive reasons for judgment. After a careful study of the record and the multitude of exhibits, we find the trial court’s findings are correct and its resolution of the case is proper. We adopt the trial court’s reasons for judgment as our own opinion in this case. We set forth those reasons in full as follows:
“REASONS FOR JUDGMENT
“This is a suit filed on September 8,1982, sounding in redhibition which alleges that during the year 1982 plaintiff purchased a 750 ton oil drilling tool and accessories from defendant and that tool was defective *236 and not fit for the use intended. Plaintiff prays for a judgment in the amount of $966,649.62 with the principal claim being $466,649.62. The additional $500,000.00 is for consequential damages. Defendant answered on November 22, 1982, generally denying the main demand of plaintiff and reconvening for the sum of $67,129.06, an open account claim for merchandise sold and delivered. Plaintiff answered the re-conventional demand by general denial.
“The application [sic] law in this case is embodied in Article 2520 of the Louisiana Civil Code which reads as follows:
“ ‘Redhibition is the avoidance of a sale on account of some vice or defect in the thing sold, which renders it either absolutely useless[,] or its use so inconvenient and imperfect, that it must be supposed that the buyer would not have purchased [it], had he known of the vice.’
“Plaintiff has basically alleged three problems with the Vareo 750 ton tool which brings the transaction under the provisions of the above quoted article. First, it complains of abnormal wear and ring deformation. It secondly complains of leveling beam damage and thirdly, and most significantly, it complains of repetitive unevenness in pipe gripping by the tool.
“The Court can dispose of the first complaint by simply stating that plaintiff did not prove by a preponderance of the evidence abnormal wear and ring deformation. The one instance, where a pronounced situation in this regard was proved, proved to be as a result, in the opinion of defendant’s metallurgist, of someone hammering on the retainer ring with a hammer and chisel. The Court feels that the leveling beam damage was sufficiently explained and was likewise an isolated instance, probably caused by either use on oversized pipe or the placing of the tool on pipe collars as explained by plaintiff's witness, Becker.
“In the Court’s opinion, plaintiff has proven beyond any doubt that the tool in question, at certain loads, tends to grip pipe unevenly and in addition, causes some indentation or ‘yielding’ of the pipe. This was established conclusively by the testing performed by Dr. Weiner and even by the paper tests performed by defendant and reviewed by Dr. Hayatdavoudi. It would serve no useful purpose to recount the details of the testing and the opinions of the various experts. Suffice it to say that the conclusion reached above is undeniable. The basic determination to be made is therefore whether or not the tool so damages the pipe which it grips that the pipe is thereby rendered unfit or that it inflicts damage to the pipe beyond that which is to be anticipated, customarily expected or generally accepted by the drilling industry, thereby rendering the tool either unfit for the purpose intended or so imperfect that a buyer would not have purchased it had he known of this problem.
“A review of the pertinent evidence in this regard reveals the following:
“1. Ken Weber, an engineering consultant expert, who performed stress testing of the pipe gripped by the tool, proved by acceptable scientific methods, that the tool does indeed grip more at the top than at the bottom and that the patterns of indentation left by the teeth of the inserts are uneven.
“2. Theodore V Bruno was qualified by plaintiff as an expert in the field of metallurgy, particularly in the area of corrosion. He testified that die marks on casing could lead to stress concentrations, the accumulation of corrosion and cracking, and possibly catastrophic failure of a well. He observed that the yielding of the pipe which he observed as a result of the various tests of which he was aware was significant; that the pipe ‘would not necessarily (emphasis supplied) be suitable for its intended purpose’ and he would not recommend the Vareo 750 ton tool to a client ‘because it damaged the pipe’. He further testified, however, that this was the first time that he had ever been called upon to evaluate casing tool gripping. It was Mr. Bruno who testified relative to the API Recommended Practice for Care and Use of Tubing at API C, page 4, 1.3, which the record quotes as follows:
*237 “ ‘Slips and tong marks are injurious, every possible effort should be made to keep such damage to a minimum by using proper, up-to-date equipment’.
“The foregoing is in italics in the pamphlet in which it appears. This particular sentence has intrigued the Court. It is a generality. It is not precise nor does it set forth any particular standard of criteria for the damages which are to be expected to be inflicted upon the pipe. The sentence is pregnant with the idea that slips and tong marks will be encountered in the drilling of an oil well.
“3. Dr. Peter Weiner, a PhD, was qualified as an expert in mechanical engineering and tube analysis. It was he who supervised Kenneth Weber’s strain gauge testing and found fault with the mathematical data produced by Vareo. He likewise calculated that the Vareo 750 ton tool on P-110 pipe has an effective slip contact area of only four to five inches rather than the ideal intended contact area of nineteen inches. When asked for an opinion about the tool in question, Dr. Weiner announced that he would not recommend the Vareo 750 to clients for even a 500 ton load.
“4. William S. Walter, an employee of plaintiff, offered no expert testimony but recounted difficulties which he, as shop foreman, had incurred with the Vareo 750 tool. It was his responsibility to send tools out to given jobs when leased by customers of plaintiff. Under cross-examination he testified that he had never withheld the sending of a Vareo 750 ton tool to any rig site and that the inserts which were changed fairly frequently were easily changed and that he never cancelled or deferred any job because of the condition of plaintiffs 750 ton tool. (Emphasis supplied.)
“5. Kenneth L. Matherne, a vice-president of plaintiff testified that he quit ‘pushing’ the 750 ton tool in May of 1982, however, under cross-examination, he testified that the tool was used in July of 1982 for a Kirby Exploration well on the world’s record string up until that time. He further testified that all job reports without exception from users of the 750 ton tool gave ‘good grcides’ to the Vareo tool and made no complaints of pipe damage. (Emphasis supplied.)
“6. Lee Matherne, brother of Ken Matherne and president of the plaintiff corporation, tendered the tools back to Vareo which initiated these proceedings. He considered the die wear on the 750 ton tool abnormal. He stated that his company never intended to use the Vareo tools again and that of his eighteen competitors, six have Vareo 750 ton tools available for use. Under cross-examination he testified that no customer of plaintiff ever complained of deformation of the pipe by the Vareo 750 ton tool or otherwise complained of Vareo equipment and that plaintiff has no record of any job which it lost due to the unavailability of the Vareo 750 ton tool. (Emphasis supplied.)
“It was during defendant’s cross-examination of Lee Matherne that it introduced as D-5, the deposition of Paul Higgin-botham, who was plaintiff’s Oklahoma field supervisor. Higginbotham established that the tool was used on the world’s record casing string and that the tools did everything that was expected of them on the job and that he personally was pleased with the performance of the Var-eo tools, having been present at every 750 ton job in the state of Oklahoma. He stated that with the exception of one job in 1982 when the leveling beam damage occurred, he incurred no difficulties with the tools. (Emphasis supplied.)
“Defendant’s first witness was Daniel Juhasz. He designed the 750 ton Vareo tool in question. He testified that defendant sold its first 750 ton tool in 1977 and since that time has had some 53 or 54 of those tools in operation. At the time he designed the tool in question, he was not aware of any strain gauge testing on the tool for Varco’s account, although Vareo had that capability at its California plant and that no strain gauge testing was done on the tools in preparation for the instant litigation although that capability was present at defendant’s California plant. *238 Basically this witness testified that his design of the 750 ton tool was no more than a linear extrapolation of an existing Vareo design.
“Defendant’s witness, Frank Campizzi, contributed little to the ultimate resolution of this matter.
“Defendant’s third live witness was Steve C. Anderson, who qualified as an expert in the field of metallurgy. It was his testimony, in effect, that there were indeed broken teeth, on the inserts which he examined, in the vertical plain, that certain of the teeth were snapped off which is consistent with an impact type of load, but he stated, however, that similar findings were had with respect to the Frank’s and Nichols’ inserts with which they were compared and that the inserts which had fallen out of the retainer, previously alluded to, was probably the result of some handheld tool (hammer and chisel) use.
“Defendant’s fourth witness, Richard Pollack, presented a slide presentation of the manufacturing process used by Vareo in making the tool.
“Defendant’s fifth live witness, Tom Becker, testified that chipped teeth are not unusual occurrences in the field and that the bent leveling beam as previously alluded to in these reasons, occurred as a result of use on oversized pipe or on drill pipe collars. Most significantly, his uncontra-dicted testimony was that American Petroleum Institute Standards 5(A)(0) permits penetrations as deep as twelve percent of the wall thickness of pipe and the measured insert penetration developed by the various testings in this case was at the most three percent of the wall thickness, well within the tolerance permitted.
“Defendant’s sixth live witness, George Boyadjieff, is defendant’s president. He holds Bachelors and Masters degrees in mechanical engineering and was accepted as an expert in those fields, over plaintiff's objection. This witness testified that teeth marks are necessary evils and are a compromise between firmly holding the pipe and creating unacceptable indentations. He advanced the theory that the strain gauge testing results should be averaged and that those results were not overwhelming evidence of bad gripping. His ultimate opinion was that the Vareo equipment owned by plaintiff was fit for the purpose intended. He stated that there were presently over 50 Vareo 750 ton tools in use as compared with only three equivalent BJ tools. His opinion was that local area deformation is not detrimental to the pipe.
“Defendant’s live witness number seven, Stephen A. Killingsworth, was accepted as an expert in the field of mechanical engineering. He testified that he found the patterns of pipe gripping by the Vareo tool satisfactory and when compared with the 350 ton BJ tool, found the BJ tool to have caused equivalent localized yielding of the pipe.
“Defendant’s live witness number eight, Paul Montgomery, was accepted as an expert in the field of petroleum engineering. This witness testified that he had been involved as a consulting engineer in between 500 and 1,000 casing jobs and that tool use or selection is established by the company drilling the well and not the casing contractor. He called the compression of the pipe to round by the gripping of the Vareo tool to be a ‘fact of life’. He examined the casing tested, saw indentations, but categorized it as a ‘consistent gripping pattern with no indications of pipe failure’. Most importantly, he found that the gripping patterns determined by testing ‘stack up’ with what is usually seen in the field.
“Plaintiff called three witnesses in rebuttal. The first, William L. Sharp, Jr., was assigned by Premiere to observe testing procedures and his testimony is of little value in the disposition of this matter. A more valuable rebuttal witness was Dr. A.Z. Hayatdavoudi, the head of USL’s Petroleum Engineering Department and a PhD who holds several patents and is an expert in drilling mechanics and failure analysis. In effect, Dr. Hayatdavoudi reviewed all of the testing and generally approved of the strain gauge testing and paper testing, although this was his first case involving elevators. It was his conclu *239 sion that the strain gauge data did indicate an ‘inference of deformity’ which might be dangerous and might cause the loss of a well and that he would not recommend the tool to any of his clients. However, all the deficiencies of which he spoke were couched in terms of ‘might he’s’ and ‘could he’s’. He stated no firm opinions as to the unsatisfactory performance of the Vareo tool to the extent that redhibition would apply.
“Plaintiffs third rebuttal witness was Dr. Weiner, who in effect, put St. Venant’s principal at rest, with regard to this litigation.
“Much documentary and other physical evidence was introduced at the trial which need not be reviewed except as referred to above.
“This leads us to the basic and crucial question of this entire litigation. What damages was plaintiff caused by the performance of the tools which it purchased from the defendant? Plaintiff purchased those tools for the specific purpose of leasing them to ultimate users. The testimony and particularly the work records of plaintiff indicate that plaintiff did not lose a single casing job, did not have a single complaint, did not ever cancel or defer any job because of Varco’s tools of [sic] their condition, or because of the effect of those tools on drilling pipe. Thus, the Court is led inevitably to the conclusion that the evidence does not preponderate that the tool is subject to any defect which ‘... renders it either absolutely useless, or its use so inconvenient and imperfect, that it must be supposed that the buyer would not have purchased it, had he known of the vice’.
“For these reasons, plaintiff’s suit will be dismissed at its cost.
“There will be judgment on defendant’s reconventional demand against plaintiff in the amount of $67,129.06 with interest from judicial demand until paid, all at plaintiff’s cost.”
The trial court was presented with several days of live testimony from expert witnesses and over 200 exhibits, in addition to depositions introduced into evidence. It was the trial judge’s task to assign weight and credibility to that evidence. We cannot say that the trial court was clearly wrong in finding that the plaintiff failed to carry its burden of proving that a non-apparent defect existed at the time of the sale or that the thing was lacking the level of quality that it was represented to have possessed.
We note that of witnesses who testified on behalf of plaintiff, three gave testimony favorable to defendant. In the text of the trial court’s reasons for judgment we have emphasized the trial court’s summary of favorable testimony given by plaintiff’s witnesses, William S. Walter, Kenneth L. Matherne and Lee Matherne. In addition, the deposition of Paul Higginbotham, a former employee of plaintiff, contained testimony favorable to the defendant which defendant introduced into evidence.
As the court in Commercial Union Ins. v. Ryland Dodge, 457 So.2d 255 (La.App. 3d Cir.1984), said:
“It is well settled that a plaintiff need not prove the underlying cause of the defect but it is incumbent that he does prove the existence of a defect at the time of the sale. La. C.C. Art. 2530 and Edelman Systems, Inc., v. Capitol GMC, Inc., 345 So.2d 99 (La.App. 1st Cir.1977), writ denied, 347 So.2d 250 (La.1977).
“Because the burden is on the plaintiff initially to establish a prima facie case, the failure to establish such a case defeats his cause of action. The burden does not shift to the defendant until a prima facie case has been established by the plaintiff by a preponderance of the evidence. Jordan v. Security Company, 425 So.2d 333 (La.App. 3rd Cir.1982).”
The trial court was correct in its conclusion that the alleged redhibitory vice was not established by a preponderance of the evidence. The tool was shown to have performed in the manner and in the capacity for which it was designed and marketed.
*240 For the above stated reasons, the judgment of the trial court is affirmed. The costs of this appeal are to be assessed against plaintiff-appellant.
AFFIRMED.