FORET, Judge.
Plaintiff, Service Hydraulics, Inc. (Service), filed suit against defendant, Serio Oil *774 Corporation (Serio), for payment of two hydraulic lift systems and accompanying oil field services.
Serio reconvened, alleging breach of warranty, together with allegations that the equipment's performance was defective.
After trial, the court found that Serio had failed to prove a breach of warranty on behalf of Service and additionally, that Ser-io had failed to prove that the equipment purchased was defective. The court rejected Serio’s reconventional demand and found in favor of Service Hydraulics, Inc. on the main demand. Serio now appeals, contending that the trial court erred in failing to find that Serio had carried its burden of proving that the equipment was defective, entitling them to a remedy in redhibition.
After a thorough review of the trial record and appellate briefs, we find neither error in law or error in fact. The trial court handed down excellent reasons for judgment. We affirm the judgment below for the reasons assigned by the trial court and annex those reasons hereto.
Costs of this appeal are taxed to plaintiff, Service Hydraulics, Inc.
AFFIRMED.
APPENDIX
12th Judicial District Court Parish of Avoyelles State of Louisiana Service Hydraulics, Inc. v. Serio Oil Corporation and Amoco Production Company, Inc.
Suit No. 85-7196B
REASONS FOR JUDGMENT
In the 1970’s, Pan American Petroleum Corporation (“Pan American”) produced oil in the Milligan Bayou area of Avoyelles Parish, a low-lying basin area which floods each spring. Production was initially from the Wilcox sand and later from deeper sands. After several years of production, pressures declined and accordingly, production declined. Production was continued for a period of time by “gas lift” which is one of the artificial lift methods. Eventually, the producer considered that production was no longer economical and the wells were plugged.*
Several years later, in 1984, when oil prices were in the $30 per barrel range, Serio Oil Corporation (“Serio”), after conducting a study of the Milligan field, considered that re-entry into some of the wells would be profitable and it entered into a farmout agreement with Amoco. It was known that an artificial lift method would be necessary and through its production superintendent, Gene Smith, Serio investigated to determine which artificial lift method would be most suitable to the field. The submersible hydraulic pump method was newer and less familiar than the so-called conventional lift methods but after considering all alternatives, Smith decided upon this method. On behalf of Serio, he negotiated a purchase from Service Hydraulics, Inc. (“Service”), an authorized dealer for Guiberson pumps which are manufactured by Dresser Industries, Inc. (“Dresser”).
A hydraulic pump lift system including a Guiberson pump was acquired from Service and installed at the first well (described hereinafter as the Martin well). Delivery was on October 15, 1984. An oral agreement was entered into by the parties under the terms of which the system would be used for a ninety day trial period during which Serio would pay only shipping and repair charges and that payment in full would be due if the equipment was not returned during the ninety day period. The oral agreement was reduced to writing and signed by Service on October 18, 1984 and by Smith on behalf of Serio on November 3, 1984. (Service Exhibit #9A)
*775 A second system, identical to the first, was ordered by Serio and delivered to the second well (referred to hereinafter as the Kirby well) with the purchase price to be paid in twelve equal monthly installments beginning on November 16, 1984.
Serio began production with its new systems but the production was less than had been anticipated. Serio was not satisfied and considerable service work was done by Service and other oil field contractors over a period of months to attempt to improve production. Apparently the worst problem was the downhole portion of the pumps “sticking” in the well. In late July or early August, 1985, Serio acquired National pumps from another supplier and installed them in both wells. In November, 1985, the National pump in the Martin well was replaced by a conventional rod pump.
The venture failed; the price of oil plunged. Serio did not make the payments called for by the purchase contracts and this action was filed by Service for a total amount of $174,693.62 for the purchase price' of the equipment and for services rendered. The suit asserts privileges on both wells under the provisions of Louisiana Revised Statutes 9:4861 et seq. and also seeks attorney’s fees as set forth in that act. Serio denied liability, reconvened against Service and filed a third party demand against Dresser, claiming that the equipment was defective; that the sale should be rescinded on grounds of redhibition; and that it was entitled to damages and attorney’s fees. Thereafter, Service filed a third party demand against Dresser alleging that if the equipment was defective, that Service should be indemnified by Dresser. Dresser denied liability and filed a third party demand against Service for the purchase price of the equipment. As explained earlier, Amoco is a party to the litigation for the limited purpose of Service asserting a privilege.
After many months of discovery and several pre-trial conferences, the case was tried on the merits over a period of several days. Many witnesses testified at the trial and many others testified by deposition. Numerous exhibits were filed in evidence and the case was submitted after counsel for all parties filed trial briefs which discussed fully all the issues involved.
Although the litigation began as a suit for collection of an account and assertion of a privilege, the disputed issues are those relating to redhibition and/or breach of warranty. There is no dispute that the equipment was purchased and not paid for and it is not disputed that Service is entitled to a privilege on the wells and the proceeds from the production if it is entitled to payment. The issues to be decided by the court are whether Serio is entitled to rescission and/or reduction of price and/or damages under the provisions of Article 2520 et seq. and Article 2475 of the Civil Code. A collateral issue, if there is a finding that the equipment was defective, is whether Serio’s reconventional and third party demands have prescribed under the provisions of Articles 2534 and 2546.
Civil Code Article 2475 provides that a seller is bound by the obligation “of warranting the thing which he sells.” Article 2520 defines redhibition as the avoidance of a sale on account of a vice or defect in the thing sold “which renders it either absolutely useless, or its use so inconvenient that the buyer would not have purchased it, had he known of the vice.” The codal articles which follow Article 2520 set forth the ramifications of the basic doctrine of redhibition.
Many factors must be considered in the application of the rules of warranty and redhibition. The threshold question is whether the product is, in fact, defective. If there is a defect, some of the other matters which must be considered are the extent or severity of the defect; the nature of the product; the sophistication vel non of the buyer with respect to the product; the representations of the seller and whether those representations were a moving cause of the purchase; whether the defect was known or should have been known by the seller; whether the defect was known or should have been known by the buyer; and whether the seller attempted to and did in fact correct the defect.
*776 In the present case, the purchase negotiations were conducted primarily — in fact almost exclusively — by William Ethridge on behalf of Service and Gene Smith on behalf of Serio. The primary thrust of Serio’s claim is that Service misrepresented the capability of the equipment. There was considerable conversation between Ethridge and Smith, but Serio’s principal assertion of misrepresentation is based upon Ethridge’s letter to Smith dated July 31, 1984 which is Service Exhibit # 8. The letter contains a discussion of pumping volume which Serio claims was a crucial factor in deciding to make the purchase. Service claims that the letter contained only estimates based upon information about the Martin well which was supplied by Serio and which was later revealed to be erroneous. The other document which is important to the negotiations issue is the “Rental Purchase Option Agreement” which is Service Exhibit # 9A. The testimony of Eth-ridge and Smith with respect to the negotiations and purchase is essentially consistent. The events which followed delivery of the equipment present the serious areas of dispute.
The testimony of the witnesses at the trial has been carefully considered together with each of the exhibits offered in evidence. Based upon that evidence, it is the finding of the court that the Guiberson pumps which were purchased by Serio from Service did not contain vices or defects warranting either rescission of the sale or reduction of the purchase price under the provisions of Article 2520 et seq. of the Civil Code of Louisiana; further, that there was no breach of warranty.
The following findings and factors were considered in arriving at that conclusion:
1) The entire re-entry venture by Serio was a very risky one with many unknowns evidenced by the fact that the prior owner of the lease, Pan American, had plugged and abandoned the wells many years before as non-economical for production.
2) The testimony establishes that the production figures in the Ethridge letter of July 31, 1984 were not meant to be nor were they considered by Serio to be anything more than estimates; the figures were based upon optimistic assumptions of fluid levels and incomplete and inaccurate data provided by Serio.
3) Serio’s key personnel, Barnett Serio, Jr., an attorney with [twenty] years experience in the oil production industry, Jeffery Kirkwood, a petroleum engineer with many years experience, and Gene Smith, an experienced production superintendent, were knowledgeable and experienced in the oil production industry and they either knew or should have known of the many risks involved in all artificial lift systems.
4) Jeffery Kirkwood, a part owner of the venture with Serio, had prior experience with hydraulic pump systems; had serious reservations about such systems; yet presumably concurred with the purchase from Service.
5) The rental purchase option agreement clearly specified the right of Serio to return the equipment within ninety days after delivery if unsatisfactory. Accordingly, it must be concluded that Serio did not consider that the equipment had been misrepresented because it elected to keep the equipment beyond the ninety day period.
6) At the meeting between Barnett Ser-io, Sr., Barnett Serio, Jr., William Ethridge, and Randy Shelby in February, 1985, which was approximately one hundred twenty days post delivery, there was no mention of dissatisfaction with the equipment or of return of the equipment or of refusal to pay. The discussion related only to Serio’s attempting to secure funds to pay for the equipment.
7) Representatives of Serio admitted that there were many undisputed debts relating to the subject wells which were not paid. When considered with the testimony about the February, 1985 meeting as mentioned in 6) above, it is clear that Serio’s financial plight was the reason for the failure to pay for the equipment.
*777 8) Gene Smith admitted that over a period of several months he worked very closely with William Ethridge and his associate Randy Shelby, in an effort to increase production of the wells and that he did not at any time complain to either of them that the equipment was defective or that it was the cause of the problems.
9) The equipment in question pumped approximately twenty thousand barrels of oil having a gross value of more than $500,000.
10) There was no significant difference in the volume production when the Gui-berson pumps were replaced with National pumps.
11) The testimony of Donnie Meadows, Wesley Fruge, and Lee Nepveux is very convincing that there was as much difficulty with the National pumps as there had been with the Gui-berson pumps.
12) The conventional lift rod pump which replaced the National pump on the Martin well was apparently not any more successful than the hydraulic pump system in producing oil in paying quantities.
13) While there is no conclusive evidence of the cause of the pumps sticking, the evidence indicates that the most probable cause was berium sulphate scaling.
14) Gene Smith testified that Ethridge and Shelby cooperated fully in attempting to increase volume and never refused to do anything that was requested.
15) The evidence suggesting that the Guiberson pumps may have been used before being sold to Serio was unconvincing and failed to refute the positive evidence that all of the equipment was new.
16) The uncontradicted testimony of Bill Hise, a consulting petroleum engineer and a member of the petroleum engineering faculty at L.S.U., was very convincing in the following particulars:
(a) The many variables and uncertainties involved in re-entry of a previously abandoned well as distinguished from drilling a new well;
(b) The maximum potential production based upon information developed after the sale of the equipment (and which had not been provided to Service) was 600-800 barrels per day with the entire system performing ideally;
■ (c) The sticking of the pumps was caused by either scale buildup or sand; and
(d) His opinion on the ultimate issue, i.e. that there was nothing wrong with the Guiberson pumps.
The court has reviewed the jurisprudence cited by counsel for Serio, particularly on the issue of burden of proof, including Fusilier v. Ardoin 266 So.2d 531 (La.App.1972), Fleur de Leis Apts. v. Davidson Sash & Door Co. 364 So.2d 234 (La.App.1978), Trigg v. Camper Village, Inc. 424 So.2d 1085 (La.App.1982), and Jones v. Information System and Supply Company 477 So.2d 814 (La.App.1985). The legal principles set forth in the cases cited by Serio are well established and present no conflict with the court’s finding in this case. There are no serious questions of law on the issue of warranty and/or redhi-bition. The issues are factual and the facts as shown in the testimony and documentary evidence clearly and certainly refute Serio’s claim.
There is no necessity to review the jurisprudence cited by counsel for Service and Dresser on the issue of warranty and/or redhibition because, as pointed out above, the issues in this case are essentially factual. However, the cases of Duplichan v. Welsh Equipment Company 479 So.2d 683 (La.App.1985) and Premiere Casing Service, Inc. v. Vareo International, Inc. 492 So.2d 235 (La.App.1986) deserve mention. Those decisions do not add anything new to the law relating to redhibition as they involved primarily disputed questions of fact. They are significant in that there are factual similarities to the present case. The Duplichan case involved a water pump and the complaint was that the estimates of the seller as to fuel consumption were not accurate. The Premiere Casing case in *778 volved a claim that an oil drilling tool was unfit for the use intended. In each case, the courts found that the purchaser failed to establish a basis for redhibition.
Those cases do not set any particular standards of proof nor do they establish any guidelines. However, they do indicate the thinking of the courts where commercial equipment is involved. It is important to remember that we are not dealing with a little old lady whose television set does not work; or whose car won’t start; or whose washing machine leaks all over the floor. This case involves complicated equipment used in an uncertain environment under very difficult conditions — equipment purchased by highly trained professionals who are knowledgeable in the business. In that setting, the clear, comprehensive and un-contradicted testimony of Bill Hise, when considered in the light of all other circumstances, is clearly entitled to great weight.
Having concluded that the evidence fails to establish a defect which warrants either redhibition or a reduction in the purchase price, it is unnecessary to consider the issues of prescription, tender or credit for use.
For the foregoing reasons, judgment is rendered as follows:
I.In favor of Service and against Serio as follows:
(a) In the sum of $98,233.14 plus legal interest on $89,998.98 from January 15, 1985 until paid and legal interest on $8,234.16 from date of judicial demand until paid plus 10% additional on the aggregate of principal and interest as attorney’s fees;
(b) Recognizing a privilege for the collection of the total amount of (a) above in accordance with the provisions of Louisiana Revised Statutes 9:4861 on the following:
That certain well and well site known as the Roy 0. Martin Lumber, Inc. A #1 Well located on the lands covered by that certain oil, gas and mineral lease owned by Serio Oil Corporation, dated August 22, 1984, recorded in Conveyance Book 159, page 815, and covering and affecting 560 acres in Section 2, Township 2 North, Range 7 East, Avoyelles Parish, Louisiana.
(c) In the further sum of $76,460.48 plus legal interest on $67,015.85 from October 16, 1985 until paid and legal interest on $9,444.63 from date of judicial demand until paid plus 10% additional on the aggregate of principal and interest as attorney’s fees;
(d) Recognizing a privilege for the collection of the total amount of (c) above in accordance with Louisiana Revised Statutes 9:4861 on the following:
That certain well and well site known as the Kirby Forest Industries, Inc. A # 1 Well located on the lands covered by that certain oil, gas and mineral lease owned by Serio Oil Corporation, which it acquired by Mineral Sublease from Santa Fe Energy Company, dated November 16, 1984, recorded in Conveyance Book 161, page 722, and covering and affecting 480 acres in Sections 3 and 4, Township 2 North, Range 7 East, Avoyelles Parish, Louisiana.
II. Dismissing Serio’s reconventional demand against Service and its third party demand against Dresser;
III. Dismissing Service’s third party demand against Dresser;
IV. In favor of Dresser on its third party demand against Service in the amount of $120,000 plus 1½% per month interest from December 1, 1985 until paid;
V. Ordering Amoco Production Company, Inc. to deliver the proceeds from the sale of oil production from the wells and/or leases described above in accordance with Louisiana Revised Statute 9:4861 and to otherwise comply with said statute as of the date of receipt of notice of the filing of the privilege described above, to wit, March 29, 1985, subject, however, to any bond or other security which may have been deposited in accordance with Louisiana Revised Statute 9:4867.
The expert witness fees of Jeffery Kirk-wood and Bill R. Hise are fixed at $200 each and the expert witness fee of George Tarver is fixed at $100. The said fees are *779 assessed as costs and Serio is cast with all costs of these proceedings.
Formal judgment will be signed accordingly.
Marksville, Louisiana this 3 day of November, 1987.
/s/ Harold J. Brouillette JUDGE, DIVISION B

 Pan American became a part of Amoco by merger and accordingly, Amoco Production Company, Inc. was made a defendant for the limited purpose of claiming the privilege authorized by R.S. 9:4861 et seq.