581 So.2d 365 (1991)
CONMACO, INC.
v.
SOUTHERN OCEAN CORPORATION.
No. 90-CA-1707.
Court of Appeal of Louisiana, Fourth Circuit.
May 30, 1991.
Kerry P. Cuccia, New Orleans, for appellant.
Charles R. Talley, David C. Vasser, Lemle & Kelleher, New Orleans, for appellee.
Before KLEES, CIACCIO and LOBRANO, JJ.
CIACCIO, Judge.
Plaintiff, Conmaco, Inc. (Conmaco) filed suit against defendant, Southern Ocean Corporation (hereinafter referred to as Ocean Salvage) to collect amounts due on an open account. Defendant filed an answer and reconventional demand alleging a cause of action in redhibition. Conmaco appeals from that part of the trial court judgment awarding Ocean Salvage damages on its reconventional demand.
Ocean Salvage was formed in 1982 under the name Southern Ocean Corporation and initially provided ocean salvage consulting services. Ian Cairns, general manager of *366 Ocean Salvage, expanded the company's operations and began performing actual salvage work with the use of rental equipment. In 1985, due to the turn in the economy, marine equipment was relatively inexpensive and Cairns foresaw the need for a large, stiff-legged derrick barge. He then sought investors and purchased the necessary equipment to construct and outfit a derrick barge capable of lifting 550 tons which was to be named the Southern Hercules.
In connection with the venture, Cairns retained the services of a naval architect, Emilio Garcia, specifically for the purpose of preparing the plans and specifications in order for the barge to be approved by the United States Coast Guard and the American Bureau of Shipping. Ocean Salvage also retained Garcia for the purpose of advising it on the stability of the derrick barge and the modification of a boom that was purchased by Cairns and was to be placed on the derrick. The boom was to be converted from a 220 ton lifting capacity to a 500 ton lifting capacity.
In order to finish the outfitting of the Southern Hercules, Ocean Salvage needed a 500 ton crane block for the derrick. Cairns therefore sought bids for certain pieces of equipment, including two pieces of wire rope and the 500 ton crane block, from three vendors, one of which was Conmaco.
Conmaco was the local independent distributor for McKissick, a Division of the Crosby Group, a manufacturer of craning blocks. Gary Harding, Conmaco's sales representative, prepared a bid which included a 500 ton craning block to be manufactured by McKissick and submitted the bid to Cairns. Conmaco's bid was not the lowest of the three bids, but after further negotiations between Harding and Cairns, Harding resubmitted a bid by letter dated August 9, 1985 which read as follows:
Dear Mr. Cairns
Conmaco, Inc. is pleased to offer the following for your consideration:
1 only500 ton Crane Block with duplex hook, 9 sheaves, 36" diameter grooved for 1¾" wire.
Sale Price$34,500.00 each
29-36" Diameter RF Sheaves grooved for 1¾" wire with 6½" timken roller
bearing.
Sale Price$975.00 each
Delivery30 days from time of firm order to procede (sic).
Terms20% with orderbalance upon delivery.
All equipment is F.O.B. Belle Chasse, LA.
The above prices will remain firm for a period of thirty days, at which time they will become subject for review. All equipment is subject to prior sale, or rental or other disposition.
Conmaco, Inc. appreciates this opportunity to quote on the above and we look forward to hearing from you in the near future. Should you have any questions or comments, or require any additional information, please do not hesitate to advise me.
 Yours truly,
 CONMACO, INC.
 /s/ Gary Harding /RB
 Gary Harding
 Sales Manager
Cairns accepted Conmaco's bid.
After Conmaco was awarded the job, Harding contacted McKissick to manufacture the block. McKissick, through Harding, obtained specifications for the block from Ocean Salvage. Based on these specifications, McKissick's engineers designed and prepared a blueprint of the block and presented it to Harding for Ocean Salvage's approval. The blueprint clearly specified the weight of the block as 17,945 pounds. Cairns reviewed the blueprint and was concerned whether the spacing of the sheaves on the block would match the equipment at the head of the boom so he called Emilio Garcia and confirmed the spacing of the sheaves over the telephone. With Garcia's approval, Cairns accepted and approved the blueprint. Harding also approved the blueprint and returned it to McKissick.
In accordance with the approved blueprint, McKissick constructed the block and *367 after completing it, delivered it to Ocean Salvage in December of 1985. Because the derrick barge was not yet complete, Ocean Salvage stored the block until February of 1986. Nevertheless, Conmaco invoiced Ocean Salvage for the block and Ocean Salvage paid $34,500.00 for the block.
In February, Ocean Salvage attached the block to the boom on the derrick barge and conducted a test run in the shipyard. The test immediately revealed that the block would not overhaul. Overhauling is the process where a block which is raised to the head of the boom returns to ground level without assistance when the brakes of the winch are released. After discussing the problem with Garcia and experimenting with the block, Cairns and Garcia determined that the weight of the block was insufficient. Cairns then contacted Harding and placed an order for cheek plates to place on the block, increasing the weight of the block. McKissick manufactured the cheek plates and Conmaco delivered them to Ocean Salvage in May of 1986. Ocean Salvage invoiced McKissick for the price of the cheek plates which cost $12,025.70. Ocean Salvage refused to pay Conmaco for the cost of the plates.
Meanwhile, Ocean Salvage had entered into a contract with Ingram Barge Lines, Inc. to use the Southern Hercules to salvage a sunken barge. Because of the insufficient weight of the block, the Southern Hercules did not operate properly and the salvage job, which had been estimated to last seven days, continued for 37 days and yet was never completed. As a result, Ingram cancelled the contract.
After termination of the Ingram contract, Ocean Salvage returned the Southern Hercules to the shipyard where they attached the cheek plates to the block. With the addition of the cheek plates the block overhauled but it still did not operate properly. The block raised and lowered in an uneven fashion, causing wear on the sheaves and wire rope. Ocean Salvage had to replace the worn wire rope as a result. Additionally, the block with the attached cheek plates no longer rested in the yoke at the head of the boom. Consequently when the barge was in tow, the block would swing and slam it into the boom, damaging the boom.
On December 12, 1986, Conmaco filed a petition on open account against Ocean Salvage for $23,831.00, including the price of the cheek plates and other items purchased by Ocean Salvage. Ocean Salvage filed its answer and reconventional demand, alleging a redhibitory defect in the block. In its reconventional demand, in addition to seeking recission of the sale and return of the purchase price of the block, Ocean Salvage sought recovery for the damage to the boom, cost for replacing the wire rope, loss of the Ingram contract and additional costs incurred on that salvage job as a result of the block's failure to operate properly. Subsequently, Ocean Salvage filed a third party demand against McKissick, alleging that it was jointly and solidarily liable with Conmaco for the defective block. Prior to trial, Ocean Salvage settled its claim with McKissick, dismissing it from the suit.
In rendering judgment, the trial judge made the following findings of fact as set forth in his reasons for judgment:
This suit was filed by Conmaco, Inc. ("Conmaco") on an open account resulting from sales by Conmaco to Ocean Salvage Corporation ("Ocean Salvage").
Conmaco sold to Ocean Salvage a five hundred ton crane block for the sum of $34,500.00 and Conmaco contracted with The Crosby Group, Inc. d/b/a McKissick ("McKissick") to design, manufacture and provide the block for use on an Ocean Salvage derrick barge to be used in salvage operations. Ocean Salvage was not knowledgeable in the requirements and specifications required to construct a block and relied upon Conmaco to construct the block. The specifications as to the numbers and size of the sheaves and the size of the wire rope were forwarded to McKissick, a manufacturer of blocks and particularly specialty or made-to-order blocks. The information was used by McKissick in designing or manufacturing a block to match the component parts of the crane operation.

*368 The block was delivered in December of 1985 and upon completion of the barge was installed in February of 1986.
It immediately became apparent on installation that the block failed to descend or freespool (overhaul).
Under these circumstances, the block was defective and could not perform for the use intended. This was confirmed by adding of additional weight to the block with jackhammers which then allowed the block to overhaul. However, due to the nature of the salvage operations, jackhammers could not correct the defect as the jackhammers got "in the way" in that the hook on the block could not be attached to the cables to effectively balance and hook up the object to be salvaged.
This block was defective.
After correspondence with Conmaco and McKissick, a cure or remedy was suggested and McKissick manufactured cheek plates to be attached to the block. As a result of the cheek plates, the weight of the block was increased from 17,000 pounds to approximately 30,000 pounds. However, the freespooling or overhauling was still restricted and did not perform properly.
In connection with the open account, Conmaco was paid $34,500.00 which was the original purchase price of the block.
On stipulation prior to trial, it was agreed that the cost of the cheek plates forming the basis of Conmaco's claim was $12,025.70 together with $7,543.50 for other items purchased from Conmaco by Ocean Salvage which are not in controversy. Plaintiff in reconvention denies an obligation to pay the cost of the cheek plates in the sum of $12,025.70 and requests a credit of that amount based on its redhibition claim, and further urges that attorney's fees should be limited to a figure based on the claim for the miscellaneous items in the sum of $7,543.50.
The Court, having heard the evidence, is of the opinion that the action in redhibition lies. Conmaco delivered a block which failed to operate for its intended use. The law, as correctly stated in Ocean Salvage's memorandum, is to the effect that an undertaker who designs and manufactures a product for a specific function or operation is responsible for the proper function for which it was designed and as a result the seller who contracts with the manufacturer to design and construct a product is responsible for its operation, and if the product contains a vice or is defective the seller is liable in redhibition. The case is fairly simple as to the defective block but the problem presented to the Court is one of damages and open account claim.
The Court summarizes its conclusions as follows:
(1) Return of Block Price The Court finds that Ocean Salvage continued to use the block in subsequent salvage operations and therefore this item is not recoverable.
(2) Damages to Wire Rope The Court finds that Ocean Salvage was aware of the problems and should have mitigated its damages by discontinuing the use of the block.
(3) Damages to the Boom The same findings apply as to the damages to the wire rope.
(4) Loss of Ingram Contract The Court assesses $42,000.00 in damages to Ocean Salvage on its action in redhibition due to its loss on the Ingram contract.
(5) Extra Costs on Ingram Job The Court assesses $120,000.00 in damages to Ocean Salvage on its action in redhibition due to its extra costs on the Ingram job.
Conmaco is due $7,543.50 under the stipulation entered into on the record, together with attorney's fees which the Court fixes at $1,508.70, with interest thereon from date of judicial demand and Court costs paid for the filing of the suit on open account.
On appeal Conmaco argues that the trial court erred in finding Ocean Salvage had a cause of action in redhibition. Specifically, it contends that the contract entered into between the parties was a contract to build rather than a contract of sale, and therefore, the trial court erred in awarding *369 Ocean Salvage damages based on redhibition.
Redhibition is defined in the Louisiana Civil Code as follows:
Art. 2520. Redhibition, definition

Redhibition is the avoidance of a sale on account of some vice or defect in the thing sold, which renders it either absolutely useless, or its use so inconvenient and imperfect, that it must be supposed that the buyer would not have purchased it, had he known of the vice.
The definition of a sale is:
Art. 2439. Sale, definition
The contract of sale is an agreement by which one gives a thing for a price in current money, and the other gives the price in order to have the thing itself.
Classifications of contracts have occasioned the courts some difficulty where the contract includes aspects of the obligation both to do and to give. Where they are inseparable, generally one of the obligations must be determined as fundamental and the rules thereunder will control. 7 S. Litvinoff, La.Civil Law Treatise: Obligations Book 2, Section 158 at page 291. However, where the object provided is not that which is contracted for, redhibition does not apply. See, The Peoples Water Service Company of Louisiana v. Menge Pump and Machinery Co., Inc., 452 So.2d 752 (La.App. 5th Cir.1984), writ denied 456 So.2d 1391 (La.1984); and Victory Oil Company, Inc. v. Perret, 183 So.2d 360 (La.App. 4th Cir.1966), writ denied, 249 La. 65, 184 So.2d 735 (1966).
In support of its contention, Conmaco cites the case of Duhon v. Three Friends Homebuilders Corporation, 396 So.2d 559 (La.App. 3rd Cir.1981). In that case, the Duhons negotiated with Three Friends to build a house. The Duhons chose the floorplan, color scheme and appliances that they desired. Three Friends constructed the house according to the Duhons' specifications on its premises. After completion, Three Friends moved it onto the Duhons' lot. Shortly thereafter, the Duhons noticed several defects in the house. After several unsuccessful attempts by Three Friends to remedy the defects, the Duhons filed suit demanding a recission of the sale. Three Friends then filed a motion for summary judgment contending the contract entered into between the parties was a contract to build, and therefore, the Duhons could not recover in redhibition. In affirming the trial court's granting of Three Friends' motion for summary judgment, the Third Circuit cited the cases of Broussard v. Pierret, 215 So.2d 136 (La.App. 3rd Cir.1968) [where a contractor built a house on a lot owned by it and then passed an act of sale purporting to convey title to the house and lot to the buyer, and the court held that the contract was a contract to build] and Henson v. Gonzalez, 326 So.2d 396 (La.App. 1st Cir.1976) [where a jeweler contracted with a cabinetmaker to build some display cases. The jeweler supplied the specifications. The cases were built at the cabinetmaker's shop and then delivered to the jeweler. The jeweler refused to take delivery contending they were unfit for their intended use. The cabinetmaker sued in contract, and the court held that the contract was a contract to build, not a contract of sale.] The court in Duhon stated:
A reading of the above cases reveal three major factors in determining whether a contract is a contract of sale or a contract to build. First, in a contact to build, the "buyer" has some control over the specifications of the object. Second, the negotiations in a contract to build take place before the object is constructed. Third, and perhaps most importantly, a building contract contemplates not only that one party will supply the materials, but also that that party will furnish his skill and labor in order to build the desired object.
396 So.2d at 561.
We find these cases distinguishable from the instant case. In those cases, although the prospective purchasers had control over the specifications and negotiations actually took place prior to the beginning of construction, the contracts between the parties provided that one of the parties to the contract would supply the labor and materials and would build, construct or fabricate the object of the contract. There were no *370 third parties involved in any of these contracts. The distinguishing factor in this case is that a third party actually supplied the labor and materials necessary for the construction of the object of the contract. McKissick as manufacturer designed and constructed the block, supplying the labor and materials. The contract between Ocean Salvage, the purchaser, and Conmaco, the seller, merely involved the transfer of the block, after its completion, from the manufacturer to the purchaser.
We find the contract between Ocean Salvage and Conmaco more analogous to the contract existing between Tidewater, Inc. and Boyce Machinery Corporation in the case of Tidewater, Inc. v. Baldwin-Lima Hamilton Corporation, 410 So.2d 355 (La. App. 4th Cir.1982). There, Tidewater purchased a crane manufactured by Baldwin-Lima through its local distributor, Boyce. The crane, manufactured according to specifications jointly drawn up by Baldwin-Lima and Boyce after their consultation with Tidewater, was shipped to American Marine Shipyards where it was installed on the LIFT TIDE, a ship being built by American Marine Shipyards for Tidewater. The crane was later removed from the LIFT TIDE and attached to a dock on the Atchafalaya River. While attached to that dock, the crane failed, causing damage to the crane itself and financial losses due to "down time" and "loss of use". Tidewater sued Baldwin-Lima and Boyce alleging negligence, a redhibitory vice, and breach of contract. Boyce filed an exception of prescription contending any claims Tidewater may have had against it had prescribed under the one year prescriptive period in LSA-C.C. art. 3536[1] for tort actions. The trial court maintained Boyce's exception. Tidewater appealed, arguing that their cause of action against Boyce was governed by the ten year prescriptive period for an action based on breach of contract. In affirming the lower court, we specifically stated:
Although the manufacturer and distributor may have consulted with plaintiff and jointly participated in the drawing up of specifications for the crane ultimately sold by the distributor to plaintiff these actions do not change this transaction from a sales contract to an obligation to do or not to do. The mere fact that an obligor may be involved in the installation and delivery of the equipment will not change the characterization of the obligation from that of a sales contract and therefore the rules governing a sale will control. FMC Corp. v. Continental Grain Co., 355 So.2d 953 (La.App. 4th Cir.1977).
410 So.2d at 357.
While Ocean Salvage as purchaser had control over the specifications and the negotiations between the parties occurred prior to the commencement of construction of the block, we find, as did the trial court, that the contract between Ocean Salvage and Conmaco was a contract of sale and not a contract to build. The trial court did not err in finding that Ocean Salvage's claim against Conmaco was based in redhibition.
We now address an alternative issue raised by Conmaco on appeal, that is, whether or not the trial court erred in finding that the block was, in fact, defective.
It is well settled that a plaintiff who alleges a redhibitory defect need not prove the underlying cause of the defect but it is incumbent that he does prove the existence of a defect at the time of sale. LSA-C.C. art. 2530 and Premiere Casing Services v. Varco International, Inc., 492 So.2d 235 (La.App. 3rd Cir.1986). Because the burden is on the plaintiff initially to establish a prima facie case, the failure to establish such a case defeats his cause of action. The burden does not shift to the defendant until a prima facie case has been established by the plaintiff by a preponderance of the evidence. Jordan v. Security Company, 425 So.2d 333 (La.App. 3rd Cir.1982).
At trial in the matter, Cairns testified that Ocean Salvage had hired Emilio Garcia, the naval architect, specifically for the *371 purpose of building the Southern Hercules. The evidence shows that although Garcia did not actually design the block in question, he was responsible for the modification of the 220 ton boom to a 500 ton boom. This entailed drawing specifications which included a block with the requisite number of sheaves properly spaced to match the equipment at the head of the boom. Ocean Salvage, with the assistance of Garcia, drafted the specifications for the block and based on these specifications sought bids for the proposed block from prospective vendors. According to Cairns, Ocean Salvage determined the number of sheaves that the block required, the type of hook and the size of the wire rope to be used. The testimony of both Cairns and Harding indicates that Ocean Salvage supplied this information to Conmaco who, through Harding, supplied it to McKissick. McKissick's engineers designed the block and created a blueprint which set forth the weight, the dimensions and other pertinent information. Harding brought the completed blueprint to Cairns for his approval. McKissick would not start construction of the block without both the purchaser's and distributor's approval. While there is conflict in the testimony as to whether or not Cairns kept the blueprint for several days before approving it, it is certain that he approved it after speaking to Garcia by telephone regarding the spacing of the sheaves as set forth on the blueprint. Although the blueprint clearly stated the weight of the block as 17,945 pounds, Cairns and Garcia never discussed the weight factor in their telephone conversation. After receiving Cairns' approval, Harding approved the blueprint and returned it to McKissick, who then began constructing the block.
The evidence in the record further indicates that the block was not a standard size block and that the configuration of the modified boom was highly unusual. While Harding testified that he knew weight was a factor in the fabrication of blocks, he stated that he was not an engineer and never calculated the weights of any blocks he had sold while working for Conmaco. It should also be noted that no where in the record does the testimony indicate that Harding was told that the block had to overhaul.
After reviewing the testimony in the record in this case, we find the trial court was clearly wrong in its conclusion that Ocean Salvage proved the alleged redhibitory vice by a preponderance of the evidence. The evidence reflects that the block was built in exact accordance with the specifications provided by Ocean Salvage, the description set forth in the purchase order, and the blueprint generated by McKissick and approved by Ocean Salvage and Conmaco. Ocean Salvage offered no evidence, lay or expert, that the block manufactured by McKissick deviated from the specifications supplied by Ocean Salvage and/or the approved blueprint, or that the manufacturer used defective parts or components, or that the block would not operate properly under normal usage, i.e., on a boom of normal length. Under these circumstances we find, as a matter of law, that the failure of the block to operate in the manner intended by the purchaser is not a redhibitory defect.
Under the standard purchase-sale transaction the seller bears the risk that the object sold will be declared defective and to have a redhibitory defect if it is unfit for the purpose intended. But, if the purchaser provides plans and specifications and the object is built in accordance with them, the failure of the object to perform in the manner intended by the purchaser does not create a redhibitory defect. A corollary in the law is the immunity from liability granted contractors under LSA-R.S. 9:2771 for defects in any work constructed if the contractor constructed the work according to plans or specifications drafted and furnished to him by another party. Under the statute, the contractor is not required to prove fault or insufficiency of plans or specifications, but rather, immunity results from proof of compliance alone. See Pittman Construction Company v. City of New Orleans, 178 So.2d 312 (La.App. 4th Cir.1965), writ denied, 248 La. 434, 179 So.2d 274 (La.1965). The reasoning behind LSA-R.S. 9:2771, that the contractor is absolved of responsibility if *372 the owner's plans and specifications are followed, is equally persuasive in this redhibition claim. Since there is no dispute that Ocean Salvage's specifications were followed when McKissick constructed the block no liability should be imposed upon the seller because of the block's unsatisfactory performance. Accordingly, we find that the trial judge erred in awarding Ocean Salvage damages based in redhibition.
For these reasons, we reverse and vacate that part of the trial court judgment in favor of plaintiff in reconvention, Ocean Salvage, and against defendant in reconvention, Conmaco, on the reconventional demand. We enter judgment in favor of Conmaco and against Ocean Salvage on the original demand, and award Conmaco $12,025.70 for the cost of the cheek plates as stipulated to by the parties at the time of trial. In all other respects, the judgment is affirmed.
AFFIRMED IN PART, REVERSED AND VACATED IN PART AND RENDERED.
NOTES
[1] Articles 3533 to 3542 were vacated by the amendment and re-enactment of Chapter 4 of Title XXIV of Book III of the Civil Code by Acts 1982, No. 173, effective January 1, 1984.