SARTAIN, Judge.
Engineering Sales, Inc., an Alabama corporation, brought this action on a contract to recover the purchase price of certain pipe which it fabricated and sold to A-l Roofing & Sheet Metal Works, Inc., a Louisiana corporation. Engineering Sales also prayed for reasonable attorney fees incurred, as provided in the contract in the event of default by the purchaser, and also for the sum of $54.00 paid in wages to workers who loaded the *243 pipe on defendant’s truck. A-l Roofing defended on the grounds that it did not authorize or approve two change orders in the contract and that the pipe delivered was defective to the extent that it was unfit for the use and purpose intended and, as a result, A-l was required to spend an amount more than the contract price in labor and materials to cure the defects and should be entitled to a reduction in the price.
The original contract price was $7,250.-00. The first change order added $443.89 and the second change order deducted $776.00, resulting in the total amount of $6,917.89, the sum claimed as the purchase price herein.
The trial judge granted judgment in favor of plaintiff Engineering Sales and against defendant A-l Roofing for the contract price of $6,917.89 and for attorney fees of $750.00. Plaintiff’s claim for $54.00 paid to workers for loading the pipe on defendant’s truck was not mentioned in the judgment. Since Engineering Sales did not answer this appeal, neither that claim nor the request made in brief for increased attorney fees is properly before us.
We affirm the result reached by the trial judge in awarding plaintiff the purchase price under the contract as modified by the change orders.
The record reveals that A-l Roofing contracted to install for Bechtel Corporation a dust collection system according to plans drawn by Bechtel’s engineer. In the first part of February, 1968, A-l Roofing realized that it alone could not fabricate the quantity of pipe needed for the job within the allotted time and began negotiations by means of several phone calls with Engineering Sales for the fabrication of some of the pipe. Mr. Wayne Thompson, president of A-l Roofing, Mr. M. K. Ferguson, his foreman, and Mr. Roland Cedarholm, president of Engineering Sales were all involved in these preliminary talks and Mr. Ferguson had made a trip to Alabama to discuss the plans. A-l Roofing mailed the drawings by Bechtel Corporation’s engineer to Engineering Sales and from those “take offs” Engineering Sales made an estimate of the job and mailed a contract proposal dated March 6, 1968, to A-l Roofing and to the attention of M. K. Ferguson with the following job description:
“We are quoting as follows on the Dust Collection Systems # 1, # 2, & # 3 and the Urea Line.
We have used the take off you sent us and are quoting only pipe, pipe flanges and elbows (30°, 45°, 60°, & 90°) as shown. We are quoting these materials 6" Dia. and larger out of black iron welded 10" dia. and smaller 16 gage, longer than 10" — 14 Gage. Each elbow has a flange at each end and each length of pipe has a flange at each end.
OUR PRICE FOR THE ABOVE ITEMS IS:
SEVEN THOUSAND TWO HUNDRED FIFTY AND NO/100 . . . $7,250.00
F.O.B. Gadsden, Alabama
We have not included taper joints branch takeoffs, ‘Y’ joints, machine connections, gaskets, bolts.
Before fabrication it would be necessary that we have exact lengths of each duct run (flange to flange).”
The standard form contract on which the above was typed in contained a clause providing that the contract "may be modified by written agreement only”.
This proposal was signed by Mr. Thompson for A-l Roofing on March 9 and returned to Mr. Cedarholm, who signed for Engineering Sales on March 13, and then, according to its terms, the contract came into existence.
Thereafter, Mr. Ferguson, A-l Roofing’s foreman, communicated to Engineering Sales some job modifications given to *244 him by Bechtel Corporation and two written change orders were made and mailed to A-l Roofing both directed to the attention of M. K. Ferguson. The first, dated March 14, did not specify the changes but included both deductions and additions. The second, dated March 19 and directed to Mr. Ferguson, began as follows:
“CONFIRMING OUR CONVERSATION OF THIS MORNING FOR DELETING 12' OF 16" DUCT AND THE 3' 6" LINES FROM THE DUCT SYSTEM.
YOU CAN DEDUCT $776.00.
H: * * ”
Mr. Ferguson went to Alabama to insure that progress was being made on the job and to clarify any uncertainties that might arise in interpreting the “take offs” or drawings obtained from Bechtel Corporation. It was understood by both parties from the beginning that time was of the essence in this contract, because A-l Roofing had to meet certain deadlines under its contract with Bechtel Corporation. Engineering Sales was to have completed and shipped part of the pipe within two weeks and the rest within three more weeks. It is not disputed that these time requirements were met, although Mr. Thompson contended that A-l Roofing was damaged by having to compensate for the deletions contained in Change Order # 2, which Mr. Ferguson, he said, had no power to authorize. However, at no time' prior to the first shipment is there any evidence that Mr. Thompson informed Engineering Sales that all contract modifications had to be approved by him. It is argued that this fact was obvious because Mr. Thompson signed the original contract on behalf of A-l Roofing whereas Mr. Ferguson only witnessed that signature. Engineering Sales responds that Mr. Ferguson had the apparent authority to bind A-l Roofing because he had been the original and primary contact man both before and after the formation of the contract, all of their correspondence had been sent to A-l Roofing without objection through Mr. Ferguson, he had visited the Alabama plant to review the drawings and to inspect the pipe fabrication and, in sum, he appeared to be the only representative of A-l Roofing with a complete knowledge of the needs of Bechtel and A-l Roofing as they related to the contract with Engineering Sales. We do not think that Engineering Sales can be faulted for relying on Mr. Ferguson’s instructions to modify the original contract under these circumstances. The change orders were received by Mr. Thompson at A-l Roofing in the middle of March, and yet he admitted taking no steps to clarify his position until April 2, after the first shipment of pipe had been received on March 31. On April 2, he said he made a phone call to Engineering Sales and told Mr. Cedarholm that Mr. Ferguson had no authority to approve a change in the contract and further that the pipe received was defective. No one from Engineering Sales testified that he remembered any such phone call or complaints. The telephone records show only that a station-to-station call was placed from A-l Roofing’s office on that date.
The second and final shipment of pipe was received on April 5, but it was not until April 10 that Mr. Thompson said he wrote a letter to Engineering Sales about the change orders and the fact that A-l Roofing was having to rework some of the pipe before installing it. No one from Engineering Sales remembered receiving that letter. In any event, the second change order had been sent about three weeks earlier and the final shipment had been received several days earlier. We must agree with the trial judge that because of his delay in complaining when time was of the essence Mr. Thompson was bound by the change orders made pursuant to instructions by Mr. Ferguson.
There is no doubt that A-l Roofing had many problems in installing a substantial portion of the pipe fabricated by *245 Engineering Sales. But the issues before us are whether it was proved that these problems arose because of a failure to perform the fabrication in a workmanlike manner, as warranted, whether such a failure caused the added expenses claimed by A-l Roofing in solving these problems and, if so, whether the amount of those expenses have been adequately proved.
A-l Roofing argues that the pipe contained redhibitory defects, such as could not have been detected on simple inspection. They included pin holes as the result of poor welding, improper angles in the elbows and flange holes that did not match up in the pipe connections. However, the testimony does not support the argument that those alleged defects were hidden. A-l Roofing’s truck driver, who delivered the pipe, testified as follows :
“Q Have you ever inspected the materials that went into this job?
A When I was painting it and everything, I couldn’t help but notice it.
Q Would you tell the Court what you noticed about the material?
A The welds wasn’t welded good, they had pin holes all in them, some of them with more than pin holes, the flanges were on crooked, wasn’t on straight, the holes were not centered up, wasn’t matched right. The pipe was out of round, it was oval-shaped.”
The workmen who installed the System likewise had no difficulty in recognizing these characteristics. None of these witnesses, however, were familiar with both the engineer’s drawings furnished to Engineering Sales by Bechtel Corporation and the interpretation and modification thereof by Mr. Ferguson.
All personnel of Engineering Sales testified that their work was performed solely and strictly in accordance with those drawings as interpreted by Mr. Ferguson. Inasmuch as they had never seen the job site and they were only making component parts rather than a complete system, they deny responsibility for any errors in the plans drawn by Bechtel Corporation. Indeed, there was no positive testimony establishing the accuracy of those plans and a workman who installed the system for A-l Roofing testified that he definitely found some errors in the engineer’s plans, although most were minor. He was asked whether the measurements were exact or rough and answered, “This is all we had to go by, it was pretty close.” Witnesses for Engineering Sales testified that the angles in the pipe were made according to the plans and that a variation of a few degrees was acceptable in the trade. In the installation in the field, minor corrections are often necessary and by leaving one flange on each pipe loose to be welded in the field, as was done here, or by using a rope gasket, such corrections could easily be made. Mr. Ferguson testified that each piece was within the acceptable tolerance of the dimensions on the drawings.
Admitting the difficulty encountered by A-l Roofing’s workmen in installing the system, allegedly due to improper angles or mismatched flange holes, we cannot say that these problems were proved to be more probably the result of poor workmanship than of inaccurate drawings. A-l Roofing simply did not prove that the pipe was not prefabricated in accordance with the specifications.
The other alleged defects, which undoubtedly resulted from the work of Engineering Sales, were the pin holes in the pipe. It is obvious A-l Roofing and its workmen who installed the system thought that the system had to be airtight, but it is equally clear that Engineering Sales did not think so and that Mr. Ferguson had never specified vacuum welds. Mr. Guttry, who supervised the job for Engineering Sales, testified that he had noticed some minor pin holes that in his opinion would *246 not affect that type of job. He explained as follows:
“Q Could a vacuum weld have been applied ?
A Yes, but it would have been a different type job than we priced.
Q Did Mr. Ferguson specify vacuum welds ?
A No.
Q What about the flanges?
BY THE COURT:
Q Let me interrupt a minute. You knew at the time that this was a dust collection system, did you not?
A Yes, sir.
Q Doesn’t the dust collection system —isn’t that a vacuum type ?
A No, sir. It has a negative pressure on it, but any tiny pin hole or anything like this would be negligible and would fill up in a short period of time, or would close up from rust. I mean it would be immaterial. It’s not like a heavy gauge pipe job that is to carry a vacuum.”
It is apparent from these facts that, if A-l Roofing had wanted air-tight material, Mr. Ferguson should have requested it or the requirement should otherwise have been made known to Engineering Sales. The latter cannot be faulted because of the failure, by silence or oversight, of A-l Roofing to make its needs under the contract known.
Whatever losses were incurred by A-l Roofing on its job for Bechtel Corporation, we agree with the trial judge that it did not prove by a preponderance of evidence that such losses resulted from any failure of Engineering Sales to perform under its contract for the fabrication of the pipe.
For the above and foregoing reasons, the judgment of the lower court is affirmed, at defendant-appellant’s costs.
Affirmed.