SEXTON, Judge.
The defendants, Bogator, Inc. (Bogator), B & M Tree Surgery, Inc. (B & M), and Alfred M. Craft, appeal an adverse judgment establishing a materialman’s lien under the Private Works Act, LSA-R.S. 9:4801 et seq. The judgment, which rejected defendants’ defense of redhibition, established the lien on the property constructed in the amount of $7,496.05, together with legal interest and costs, plus attorney fees in the amount of $4,000.00. We affirm in part and reverse in part.
Louisiana Industries furnished concrete to B & M from August 1 through September 8, 1989. B & M, the contractor, incorporated this concrete into an alligator barn being built on property owned by Mr. Craft. Mr. Craft, who has been in the construction industry and involved with all aspects of concrete for 30 years, designed the alligator barn based on recommendations from a Dub Hatten, who had earlier built a similar structure. On September 6, 1989, Mr. Craft sold a portion of the property on which the alligator barn was being constructed to Bogator in exchange for stock in their corporation.
The defendants filed neither the contract nor a bond pursuant to the Private Works Act. On October 25, 1989, Louisiana Industries recorded a sworn statement of amount due in the mortgage records for Ouachita Parish. At trial, there was no dispute that plaintiff had not been paid $7,496.05 for concrete provided. Defendants defended the lawsuit, claiming they were not liable for such amount due to redhibitory defects in the concrete provided. Specifically, defendants contended that cracks and the subsequent leaks in the concrete constitute redhibitory defects.
Evidence at trial established that cracking is normal in concrete because it shrinks when it dries. Furthermore, temperature changes will also cause cracks in concrete. Three methods to control, though not to eliminate, cracking are commonly used. A construction joint occurs naturally at the end of a concrete pour. Contraction joints are similar to construction joints, but intentionally created. In both of these situations, the cracks will predominately occur at the location of the joints. A third method of controlling cracks is to use reinforcement in the concrete which will increase the number, but decrease the size of the cracks. With reinforcement, the total magnitude of cracking in the concrete will be unaffected, but the number of cracks will be increased. As there is a greater number of cracks, but no increase in the total extent of cracking, each individual crack will be smaller in size and therefore less susceptible of leaking. The small cracks may self-heal; as water passes through the cracks, calcium will deposit out of the water and seal the cracks. Concrete reinforcement can take the form of steel rods or wire mesh. Finally, where leaking might be anticipated, in, for example, a swimming pool or arguably an alligator barn, where water is constantly present, a watertight membrane is generally used to prevent leaking.
*216 In the construction of the instant alligator barn, there was no evidence that a watertight membrane was used. Instead of wire mesh reinforcement, an apparently new product, Fibermesh, was used. The use of the Fibermesh is at the center of defendants’ redhibition defense.[1]
Mr. Craft admitted that he initiated the discussion of Fibermesh with Louisiana Industries sales representative, Jesse Guin. Mr. Craft had heard of the product from Mr. Hatten, who had used it in his alligator barn. Louisiana Industries furnished Mr. Craft with a brochure regarding Fibermesh from the makers of that product. That brochure claims that Fibermesh is an alternative to wire mesh and will, among other things, hold cracks together and reinforce against water migration. Mr. Guin and Basil Doles, Jr., the general manager of Louisiana Industries, each testified that their company does not recommend Fiber-mesh as a substitute for wire mesh or steel reinforcement. Mr. Craft acknowledged that Mr. Guin did not recommend nor in any way represent the attributes of Fiber-mesh. Nevertheless, the defendants’ redhi-bition defense against Louisiana Industries stems primarily from their inclusion of Fi-bermesh with the concrete provided and its alleged failure to live up to the claims in the Fibermesh brochure. Simply put, defendants base their redhibition defense on the fact that, but for the misrepresentations in the Fibermesh brochure provided by plaintiff, they would have ordered wire mesh or other steel reinforcement in the concrete and thus avoided the problems which ensued.
Following a bench trial, the trial court issued written reasons for judgment. After noting the facts and that a material-man’s lien was appropriate, the trial court considered defendants’ redhibition defense. The trial court noted that, although the concrete supplied by plaintiff had cracked, the evidence further showed that all concrete will crack. The trial court was satisfied that the overall strength of the concrete was greater than that requested by defendants.[2] The trial court noted that it was most impressed with the testimony of plaintiff’s expert, Jerry M. Madden, a civil engineer with special expertise in structural engineering and construction. Mr. Madden testified that the cracks in the foundation were due to errors in the design of the building.
The trial court found defendants had failed to prove redhibitory defects in the concrete. The trial court therefore rendered judgment for plaintiff in the amount of $7,496.05 plus legal interest and costs. Further, the trial court found that plaintiff had complied with the statutory requirements of LSA-R.S. 9:2781 entitling plaintiff to attorney fees in the amount of $4,000.00 for defendants’ failure to pay an open account. Finally, a lien and privilege on the building and one acre of land was recognized in favor of plaintiff. Defendants’ appeal follows judgment in this regard.
REDHIBITION
Defendants’ initial argument is that the trial court was manifestly erroneous in finding no redhibitory defects in the concrete provided by plaintiff. Redhibition is the avoidance of a sale on account of some vice or defect in the thing sold, which renders it either absolutely useless, or its use so inconvenient and imperfect that it must be supposed that the buyer would not have purchased it, had he known of the vice. LSA-C.C. Art. 2520; Holloway v. *217 Gulf Motors, Inc., 588 So.2d 1322 (La.App. 2d Cir.1991). A seller is bound by an implied warranty that the thing sold is free of hidden defects or redhibitory vices. LSA-C.C. Art. 2476; Karageorge v. Cole, 565 So.2d 502 (La.App. 2d Cir.1990).
In the instant case, plaintiff supplied the product which had been specifically requested by Mr. Craft, concrete with Fiber-mesh, rather than steel reinforcement. The decision to use Fibermesh was made exclusively by Mr. Craft based on his conversation with a disinterested third party, Mr. Hatten, and the information provided in the Fibermesh brochure. Although the brochure was provided to Mr. Craft by the plaintiff, this was only at the request of Mr. Craft. There is no showing that plaintiff was in any way responsible for the contents of the Fibermesh brochure. Further, Mr. Craft admitted that none of plaintiff’s employees recommended or represented the attributes of Fibermesh. Plaintiffs employees specifically testified that they did not, and would not, represent Fi-bermesh as a substitute for wire mesh or steel reinforcement. Clearly the decision to use Fibermesh was made exclusively by Mr. Craft, a man who claimed to have 30 years of experience in all aspects of concrete.
Assuming the use of the Fibermesh rendered the alligator barn defective, this circumstance resulted from Mr. Craft’s decision to use a relatively new product, Fi-bermesh, in lieu of standard steel reinforcement. Plaintiff supplied the concrete in accordance with the specifications provided by Mr. Craft. The trial court conclusion that any problems in the alligator barn stemmed not from a redhibitory vice but rather from defective design is not clearly wrong, and thus the rejection of the redhi-bition defense was appropriate.
Where, as here, a seller provides a product in accordance with the plans and specifications provided by the purchaser, the failure of the product to perform in a manner anticipated by the purchaser does not amount to a redhibitory defect. Conmaco, Inc. v. Southern Ocean Corporation, 581 So.2d 365 (La.App. 4th Cir.), writ denied 586 So.2d 533 (La.1991); Engineering Sales, Inc. v. A-1 Roofing & Sheet Metal Works, Inc., 246 So.2d 242 (La.App. 1st Cir.1971).
ATTORNEY FEES
By this assignment of error, defendants argue that the trial court was in error in awarding attorney fees pursuant to LSA-R.S.' 9:2781 for the failure to pay an open account. We find merit in this argument and reverse the trial court’s award to plaintiff of $4,000.00 in attorney fees.
LSA-R.S. 9:2781 provides for the recovery of attorney fees by a successful plaintiff for the prosecution and collection of the amount due on open account following a defendant’s failure to pay such open account within 15 days of written demand. LSA-R.S. 9:2781 B allows an award of attorney fees in certain circumstances where, despite the plaintiff’s due diligence, delivery of written demand could not be accomplished. As an award of attorney fees is exceptional and penal in nature, the statute must be strictly construed. Frank L. Beier Radio, Inc. v. Black Gold Marine, Inc., 449 So.2d 1014 (La.1984); Chaney Oil Company of Vicksburg v. Beard, 446 So.2d 849 (La.App. 2d Cir.1984). The plaintiff has the burden of proving its entitlement to attorney fees under LSA-R.S. 9:2781 by proof of either the defendant’s receipt of written demand or proof that plaintiff exercised due diligence in attempting delivery of the written demand. Sandair Corporation v. Davis Industries, 470 So.2d 279 (La.App. 5th Cir.1985); Customer Service Electric Supply Corporation v. SCR & Associates, Inc., 417 So.2d 423 (La.App. 1st Cir.1982).
In the instant case, the written demand which plaintiff attempted to have delivered was sent certified mail, return receipt requested, but was returned to plaintiff unclaimed. The letter had been addressed to Mr. Craft and B & M at 506 Comanche Trail, West Monroe, Louisiana. In its appellate brief, plaintiff argues that if Mr. Craft did not reside at 506 Comanche Trail, he would have so testified at trial. *218 Plaintiffs argument places the burden on the wrong party. It is plaintiffs burden to establish its entitlement to attorney fees under LSA-R.S. 9:2781. It is not defendants’ responsibility to prove how plaintiff failed to establish that claim. Irwin Brown Company v. Morton’s Auction Exchange, Inc., 446 So.2d 403 (La.App. 4th Cir.1984).
The instant case is analogous to Customer Service Electric Supply Corporation v. SCR & Associates, Inc., supra. In that case, plaintiff filed suit to recover an amount due on open account. Seeking to establish its right to attorney fees under LSA-R.S. 9:2781, plaintiff presented evidence that it sent a demand letter to the defendant corporation’s post office box. That letter had been returned by the post office stamped “Box Closed — No Order.” The First Circuit stated that this “alone would not support a factual finding that plaintiff exercised due diligence in attempting to deliver written demand to the defendant.” Customer Service Electric Supply Corporation v. SCR & Associates, Inc., supra, at 425. The court noted that there was no evidence that plaintiff had made any other efforts to deliver the demand letter, no evidence that plaintiff did not know the location of defendant’s place of business or where to locate any officers or employees of the defendant. Finally, the court noted that when the lawsuit was initiated, plaintiff had defendant served through its agent for service of process, but no evidence was presented why the demand letter could not also have been sent to that agent.
In the instant case, evidence presented by plaintiff shows that, in connection with the construction project, it sent all of its invoices to B & M at Route 4, Box 221-A, West Monroe, Louisiana. Further, there was an operating alligator farm on the premises at issue in this case, and it must be assumed that employees of defendants worked at this alligator farm. Plaintiff failed to show why it did not attempt to send the demand letter to defendants at either of these locations. Further, in initiating this lawsuit, plaintiff had Bogator served through its agent for service of process, James Rountree, yet there was no evidence that plaintiff attempted to send the demand letter to Mr. Rountree. Although plaintiff’s petition requested that Mr. Craft and B & M be served at the Comanche Trail address, service was actually made on Mr. Craft personally and in his capacity as agent for B & M at an address listed as 437 Northwood Drive. Plaintiff presented no evidence why it could not locate Mr. Craft for purposes of mailing its demand letter when the deputy sheriff who served Mr. Craft apparently had no such problem.
We agree with the First Circuit decision in Customer Service Electric Supply Corporation v. SCR & Associates, Inc. that evidence that a demand letter was mailed,but returned unclaimed, standing alone, is insufficient evidence that plaintiff exercised due diligence in attempting to deliver written demand to the defendants for purposes of LSA-R.S. 9:2781. Accordingly, that portion of the trial court judgment which awarded $4,000.00 attorney fees to the plaintiff will be reversed.
OWNERS UNDER THE PRIVATE WORKS ACT
By their final assignment of error, defendants argue that Mr. Craft and Bogator should not have been held personally liable for plaintiff’s claim. Accordingly, for purposes of this argument, defendants concede that B & M was properly found liable as the contractor who entered into the contract with plaintiff for delivery of the concrete. Further, there is no dispute that the materialman’s lien on the subject property was appropriately recognized.
In support of this assignment of error, defendants cite LSA-R.S. 9:4806 B, which provides:
The claims against an owner granted by R.S. 9:4802 are limited to the owner or owners who have contracted with the contractor or to the owner or owners who have agreed in writing to the price and work of the contract of a lessee, wherein such owner or owners have specifically agreed to be liable for any *219 claims granted by the provisions of R.S. 9:4802: If more than one owner has contracted each shall be solidarily liable for the claims.
Defendants allege that there was no evidence presented that Mr. Craft contracted with B & M in relation to the construction project and therefore no basis for assessing Mr. Craft with personal liability under LSA-R.S. 9:4806 B. Although a written contract between Mr. Craft and B & M was not admitted into evidence, we find no other reasonable inference but that Mr. Craft, as owner of the property, did contract with B & M to have the alligator barn installed. Mr. Craft designed the alligator barn, he dealt directly with the plaintiff, he specifically requested that Fiber-mesh be used, and he employed Randy Sturgis as the concrete finisher at the alligator barn. In general, Mr. Craft appears to have overseen the entire alligator barn construction project. Although defendants claim that Mr. Craft was merely acting as agent for B & M, we find defendants’ assertions, when carried to their logical conclusion, to be an unreasonable interpretation of the evidence. Under defendants’ proposed interpretation, B & M was gratuitously constructing the alligator barn on Mr. Craft’s property in the absence of an agreement between B & M and Mr. Craft. We reject this proposal and find that the only reasonable interpretation of the evidence is that a contract existed between B & M and Mr. Craft, sufficient under LSA-R.S. 9:4806 B to hold Mr. Craft personally liable for the price of the concrete.
We reach a different conclusion in considering whether sufficient evidence was presented to find a contract existed between B & M and Bogator, such that Bogator could be held personally liable. The supply of concrete from plaintiff began on August 1, 1989 and continued until September 8, 1989. Bogator did not become an owner of the property until September 6, 1989. As merely a prospective purchaser, Bogator could not be personally liable as an owner prior to September 6, 1989. Circle H Building Supply, Inc. v. Dickey, 558 So.2d 680 (La.App. 1st Cir.1990). Further, for the period between September 6 and September 8, 1989, although Bogator was an owner, there is no evidence that it contracted with B & M. Rather, as previously discussed, the evidence must logically be interpreted as showing that Mr. Craft had already contracted with B & M. At most, the evidence shows Bogator became an owner of the property aware that the construction project was ongoing. Such knowledge, however, is insufficient to assess personal liability against Bogator. Clegg Concrete, Inc. v. Bonfanti-Fackrell, Ltd., 582 So.2d 465 (La.App. 1st Cir.1988). Accordingly, the judgment will be reversed to the extent that it extends personal liability to Bogator.
CONCLUSION
For the above and foregoing reasons, the judgment appealed from is reversed to the extent that personal liability was assessed to Bogator, Inc. Further, the award of $4,000.00 in attorney fees to plaintiff is reversed. In all other respects, the judgment is affirmed. Costs of this appeal are assessed one-half to plaintiff and one-half to defendants, B & M Tree Surgery, Inc., and Alfred M. Craft.
AFFIRMED IN PART, REVERSED IN PART, AND RENDERED.

. There is some evidence that the Fibermesh was inadvertently omitted from some of the earliest loads of concrete. However, as defendants' argument is based on the absence of the steel reinforcement due to the use of Fibermesh, the absence of Fibermesh from the early loads becomes a nonissue. None of the concrete contained steel reinforcement. Defendants argue that the absence of the steel reinforcement, not necessarily the presence of the Fibermesh, was the reason for the extensive cracking in the concrete.

. The specifications called for concrete with a strength of 3000 PSI to be used in the alligator barn. Plaintiffs expert, Jerry Madden, estimated that the strength of the concrete actually used was approximately 4000 PSI. Defendants’ witness, Jack Green, a general contractor for 25 yéars, acknowledged that there was no problem with the strength of the concrete.