# STATE OF LOUISIANA
# COURT OF APPEAL, THIRD CIRCUIT

## 11-1274

**HUEY D. BONNETTE, ET UX.**

**VERSUS**

**FORD MOTOR COMPANY, ET AL.**

**********
APPEAL FROM THE
PINEVILLE CITY COURT
PARISH OF RAPIDES, DOCKET NO. 9-0077
HONORABLE J. PHILLIP TERRELL, PRESIDING
**********

## SYLVIA R. COOKS
### JUDGE
**********

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Sylvia R. Cooks, and Billy Howard Ezell, Judges.

**AFFIRMED.**

**Fred A. Pharis**
**Pharis Law Offices**
**831 DeSoto Street**
**Alexandria, LA 71301**
**(318) 445-8266**
**COUNSEL FOR PLAINTIFFS/APPELLEES:**
        **Huey and Margaret Bonnette**

**Robert W. Maxwell**
**Bernard, Cassisa, Elliott & Davis**
**1615 Metairie Road**
**P.O. Box 55490**
**Metairie, LA 70055-55490**
**(504) 834-2612**
**COUNSEL FOR DEFENDANT/APPELLANT**
        **Ford Motor Company**

**COOKS, Judge.**

In this automobile redhibition case, the Defendant-Manufacturer appeals the lower court judgment awarding the Plaintiffs-Buyers a return of the purchase price, all expenses surrounding the sale, and attorney fees. For the following reasons, finding no manifest error in the lower court's finding that Plaintiffs met their burden of proving the vehicle was defective when purchased and that they would not have purchased it had they known of the defect, we affirm the judgment.

## FACTS AND PROCEDURAL HISTORY

On December 7, 2007, Plaintiffs, Huey and Margaret Bonnette, purchased a pre-owned 2007 Ford Freestyle from Marler Ford (hereafter Marler) for $19,200.00 plus tax, title and licence. The vehicle had 26,670 miles at the time of purchase and was a "Quality Checked" Certified Pre-Owned Car warrantied by Ford Motor Company (hereafter Ford). The warranty was for six years of limited warranty coverage from the original Ford Vehicle Limited Warranty start date, or up to 75,000 miles, whichever came first.

The vehicle was originally purchased from Ford by Hertz Car Rental on June 10, 2006. It was used by Hertz as a rental car during which it accumulated 18,619 miles. The vehicle was then sold to Marler by way of a Texas car auction company, and for the next seven months was used by Marler for customer and employee transport, incurring an additional 8,052 miles.

Plaintiffs first began to notice a different, unpleasant smell in the car. After complaints by the Plaintiffs, Marler had the vehicle detailed at RJ's Car Wash in January, 2008. According to Plaintiffs, upon getting the vehicle back from RJ's, there was a significant amount of water on the floorboard of the vehicle. Huey Bonnette testified he assumed RJ's had simply left the moon roof open during the car wash and called them and had the water vacuumed out of the vehicle.

Unfortunately, this began a continuous pattern of recurring water leaks which are well documented in the record of these proceedings. Plaintiffs testified during normal use of the vehicle, they experienced continual water leaks which led to dripping in the vehicle's interior. Plaintiffs stated the leaks were so significant, that they were forced to put a towel on the seat and a plastic bag on the driver's legs. Frequent vacuuming of the accumulated water in the interior of the vehicle was required. Plaintiffs also stated water accumulated in the spare tire well near the hatchback of the vehicle. Plaintiffs testified they were forced to get a replacement vehicle for Margaret Bonnette because the mildew odor prevented her from driving the vehicle.

Several attempts at repairs were made. Eventually, Danny Webb, the owner of Marler, told Plaintiffs the water leaks could not be fixed and they should consider contacting an attorney. Plaintiffs did so and on February 9, 2009 filed a suit for redhibition in the Pineville City Court. It alleged extensive, unrepaired interior water leaks in the 2007 Ford Freestyle. The petition detailed several attempts at remedying the defect by Marler. Named defendants were Ford (the manufacturer), and Marler (the seller). Plaintiffs requested the return of the purchase price, all expenses surrounding the sale, judicial interest, and attorney fees.

Both Ford and Marler responded with answers denying liability. The matter proceeded to trial, and Plaintiffs testified as to the problems they experienced with the vehicle. They also called the court's attention to a "Technical Service Bulletin" (TSB) which had been issued on July 3, 2006, which documented a moon roof drain routing problem with the 2007 Ford Freestyle. Ford countered that the mere fact a TSB is prepared and sent to dealers does not in and of itself indicate there is anything inherently wrong with that particular make of vehicle. They maintained a TSB is used as a "resource reference" for technicians to use to help

2

identify the potential sources of a problem, if one exists, when a vehicle is brought in for repair.

Ford also presented the testimony of a Ford Field Service Engineer, Chris Furnas, who maintained there were no problems or defects in the vehicle that caused leaks. It was hypothesized that the leaking problems were likely caused by pine needles and other debris clogging various drains in the vehicle. Mr. Furnas also maintained if there were inherent problems with the vehicle due to defects in its manufacture, the problems would have begun before the vehicle was sold to Plaintiffs. Ford maintained there were no previous leaking problems with the vehicle prior to the sale to Plaintiffs, although no documentation of that was introduced below.

After taking the matter under advisement, and allowing the parties to present a post-trial memorandum, judgment was rendered in favor of Plaintiffs and against Ford, finding Plaintiffs met their burden of proving the vehicle was defective when purchased and that they would not have purchased it had they known of the defect. The lower court ordered the rescission of the sale of the vehicle in the amount of $19,200.00, plus $3,433.00 in increased finance damages, $1,436.50 paid to public officials, $62.00 in notary fees and insurance costs of $3,976.20. The lower court also awarded Plaintiffs $12,375.00 in attorney fees. Legal interest was due from the date of judicial demand, and Ford was cast with all costs of the proceedings.

The lower court specifically held Marler was free from fault and all claims against it were dismissed. Ford was also ordered to indemnify Marler for $7,500.00 it incurred in attorney fees.

Ford appealed the judgment, arguing the lower court "improperly concluded there was a defect in the vehicle when it left the factory, and, as such, finding in Plaintiffs' favor. For the following reasons, we affirm the lower court judgment.

3

**ANALYSIS**

Redhibition is defined in La.Civ.Code art. 2520, and "is the avoidance of a sale on account of some vice or defect in the thing sold, which renders it either absolutely useless, or its use so inconvenient and imperfect, that it must be supposed that the buyer would not have purchased it, had he known of the vice." *Louisiana Industries v. Fogator*, 605 So.2d 213, 216 (La.App. 2 Cir. 1992). The existence of such a defect gives a buyer the right to obtain rescission of the sale or a reduction in the price. La.Civ.Code art. 2520.

The warranty of La.Civ.Code art. 2520 is applicable to used as well as new things. *Karageorge v. Cole*, 565 So.2d 502 (La.App. 2 Cir. 1990). Used things must operate "reasonably well for a reasonable period of time." *Id*. at 508. *See also Wagnon v. Hebert*, 520 So.2d 1136 (La.App. 3 Cir. 1987).

The buyer has an action against the manufacturer for any defects which "existed at the time the thing was delivered by the manufacturer to the seller." La.Civ.Code art. 2531. While a buyer may sue a manufacturer directly for redhibitory defects, the manufacturer is liable but only for defects "resulting from the original manufacture" of the product. *Rey v. Cuccia*, 298 So.2d 840, 845 (La.1974). "[A] manufacturer is conclusively presumed to have knowledge of defects in the object it produces. *Young v. Ford Motor Co., Inc.*, 595 So.2d 1123, 1126 (La. 1992), (citing *George v. Shreveport Cotton Oil Co.*, 114 La. 498, 38 So. 432 (La.1905)).

"A buyer of an automobile who asserts a redhibition claim need not show the particular cause of the defects making the vehicle unfit for the intended purposes, but rather must simply prove the actual existence of such defects." *Young v. Ford Motor Co., Inc.*, 595 So.2d 1123, 1126 (La.1992); *Crawford v. Abbott Automobile Co.*, 157 La. 59, 101 So. 871 (1924). The buyer in a redhibition action is also not required to negate all other causes of a defect. *Ewing and Salter,*

4

*Inc. v. Gafner Automotive & Mach., Inc.*, 392 So.2d 762 (La.App. 3 Cir.1980), *writ denied*, 396 So.2d 933 (La.1981). "The buyer may prove the existence of redhibitory defects at the time of the sale not only by direct evidence of eyewitnesses, but also by circumstantial evidence giving rise to the reasonable inference that the defect existed at the time of the sale." *Rey*, 298 So.2d at 843.

On appeal, a trial court's determination as to the existence of a redhibitory defect is factual in nature and will not be reversed absent manifest error. *Miller v. Ford Motor Co.*, 01-1299 (La.App. 3 Cir. 2/6/02), 815 So.2d 997; *Ollis v. Miller*, 39,087 (La.App. 2 Cir. 10/29/04), 886 So.2d 1199. Our review of the record reveals no manifest error in the lower court's finding of redhibitory defects.

On appeal, Ford contends the Plaintiffs did not meet their burden of proving a defect existed in the car at the time of its manufacture. It argues the leaking problems were caused by Plaintiffs' failure to perform routine maintenance to remove debris which clogged the drain tubes. Ford attempts to buttress this hypothesis by stating the record "established the vehicle did not have a leak problem when it was owned and operated by Hertz Rental Car and Marler Ford and when it went through numerous inspections." We find Ford failed to introduce any evidence to support this alleged fact.

As to Ford's argument that it was Plaintiffs' lack of maintenance on the drains that led to the leaks, it is clear that leaking problems continued even after several repair attempts were made. It would be ridiculous to suggest that any repair attempt, particularly one that involved a disassembly of the front area of the vehicle, would not involve removal of any debris found clogging the drains. However, even after the numerous repair attempts, leaking problems continued to manifest themselves with the vehicle. This perhaps explains the lower court's apparent dismissal of Ford's argument that the leaks were caused by pine needles and debris clogging the drains. It cannot reasonably be expected that the owner of

5

the vehicle is required to continually perform maintenance to simply open the moon roof.

Moreover, the TSB produced at trial supported Plaintiffs' assertion that the leaking problems were the result of a manufacturing defect in the Ford Freestyle. The TSB, produced on July 3, 2006, titled "Water Leak – Roof Opening Panel", indicated there were problems with the moon roof drain system leaking on certain Ford vehicles, including the 2007 Ford Freestyle. It specifically provided that "[c]urrent rear drain tube routing may not be adequate to handle water when vehicle is parked with the front of the vehicle on a slight incline." This TSB, at a minimum, lends support to the lower court's finding of a defect in the design of the Ford Freestyle's drain routing, such that it rendered use of the vehicle "inconvenient and imperfect."

Ford also argued that any defect in the manufacture of the vehicle would have manifested itself prior to Plaintiffs' purchase, and the record established no such leaking problems occurred when the vehicle was owned and used by Hertz and Marler. Although Ford relies on its self-serving assertion that no leaking problems with the vehicle occurred when it was owned by Hertz and Marler, there was no evidence in the record supporting this assertion. No records were subpoenaed from Hertz nor did a representative from the company testify. While Ford states in its brief that Marler certified there was no damage in "these areas" prior to the sale, the inspection form introduced at trial only stated "[a]ny item(s) that did not pass our 115-point inspection have been replaced or repaired." No Marler employee was called to testify and questioned by Ford regarding problems involving the moon roof or lack thereof prior to the present sale. Therefore, the lower court, in its discretion as the trier of fact, likely discounted or found no evidentiary value in assessing the form.

6

We also note the cases cited by Ford, in which redhibitory defects were not found to exist, all involved cases where the buyer lost at the trial court level, and manifest error was not found by the appellate courts on review. In its reply brief, Ford cites the recent decision in *Cazaubon v. Cycle Sport, LLC*, 11-289 (La.App. 1 Cir. 11/9/11), ___ So.3d ___, wherein the First Circuit reversed, finding the trial court was clearly wrong in finding the existence of a redhibitory defect. However, the court in *Cazaubon* specifically found "[t]here was no evidence offered to prove that anything was ever actually wrong with the engine." *Id.* at ___. In this case, there were obvious problems with the drain tubes of the vehicle which led to leaking problems, and the trial court found these problems were the result of a defect in the manufacture of the vehicle.

## DECREE

After a thorough review of the record, we are satisfied the lower court did not err in finding Plaintiffs met their burden of proving by circumstantial evidence, and logical inferences, that a defect existed in the manufacture of the vehicle. Thus, we affirm the judgment finding a redhibitory defect existed in the vehicle and awarding return of the purchase price, all expenses surrounding the sale and attorney fees. All costs of this appeal are assessed to Defendant-Appellant, Ford Motor Company.

**AFFIRMED.**